

**SEALED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID NAME "KENDALL DEMARKO WYSINGER"/USER ID "100002283315590" AND FACEBOOK USER ID NAME "DEMARKO WYSINGER" THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC.** | **SEALED** <br><br> **Case No.** 5:18-mj-00025 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Thomas F. Hickey, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the following accounts:  (1) user ID "Kendall Demarko Wysinger" and user identification account number 100002283315590, found at "www.facebook.com/Kendall.Wysinger" ("SUBJECT ACCOUNT 1") and (2) the user ID

"Demarko Wysinger" found at "www.facebook.com/Demarko.Wysinger" ("SUBJECT ACCOUNT 2").

2.     I have been a Special Agent with the United States Drug Enforcement Administration (DEA) since February 1999. I am currently assigned to Enforcement Group 49, Winchester Resident Office, of the DEA Washington Division Office and am co-located with the Northwest Virginia Regional Drug and Gang Task Force (NWVRDGTF). I have received training in all areas of narcotics investigations including search and seizure laws and statutes pertaining to enforcement of the Controlled Substances Act. Since becoming a federal law enforcement officer in 1992, I have either conducted or assisted other law enforcement officers in conducting numerous narcotics investigations that have resulted in the arrest and conviction of numerous individuals. I have participated in the investigation of human trafficking and prostitution crimes, including sex trafficking in violation of 18 U.S.C. § 1591 and transportation in interstate commerce for prostitution in violation of 18 U.S.C. § 2422. I have received training in investigations and prosecutions of sex trafficking, particularly in the intersections of drug trafficking, prostitution, and sex trafficking, and have assisted in the investigations into sex trafficking operations. I have also participated in the investigation of witness tampering and obstruction of justice crimes, in violation of 18 U.S.C. § 1512.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1512, 1591, and 2422 have been

2

committed by KENDALL DEMARKO WYSINGER. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## RELEVANT STATUTES

5.      This investigation concerns alleged violations of 18 U.S.C. § 1512, relating to attempts to tamper with witnesses and evidence in a federal investigation, 18 U.S.C. § 1591 relating to the sex trafficking of an adult, 18 U.S.C. § 2422 relating to the transportation of an adult in interstate commerce to engage in prostitution, and 21 U.S.C. § 841 relating to the distribution of a controlled substance and/or the possession of a controlled substance with intent to distribute.

6.      18 U.S.C. §1512 prohibits a person from knowingly using intimidation, threatening, or corruptly persuading another person, or attempting to do so, or engaging in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding. Punishment for this offense carries up to 20 years in prison.

7.      18 U.S.C. § 1591 prohibits a person from knowingly recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing or soliciting by any means another individual, knowing that force, threats of force, fraud and/or coercion will be used to cause that individual to engage in a commercial sex act. Punishment for this offence under ranges from 10 years to life in prison.

8.      Title 18 U.S.C. § 2422 prohibits a person from knowingly persuading, inducing, enticing, or coercing another individual to travel in interstate or foreign commerce to engage in prostitution. Punishment for this offense carries up to 20 years in prison.

9.      21 U.S.C. § 841 makes it unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.  Punishment for this offense carries up to 20 years in prison, or up to life in prison if certain aggravating factors are present.

## PROBABLE CAUSE

10.      During my investigation, I have developed information to believe that KENDALL DEMARKO WYSINGER used SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2 to communicate with individuals for the purpose of engaging in prostitution and drug trafficking, and has used SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2 to communicate with potential witnesses to his criminal activities.  Further, my investigation has revealed KENDALL DEMARKO WYSINGER used various means to make contact with individuals working in prostitution, and positioned himself to supply those individuals with controlled substances for their personal use.  In addition, I believe KENDALL DEMARKO WYSINGER used his connection as a drug supplier to recruit some of these individuals into working for him in prostitution and in further distributing his drugs to their prostitution customers.

11.      In June 2015, two female individuals at the scene of a suspected heroin overdose in Winchester, Virginia, reported that they received the heroin involved in that overdose from KENDALL DEMARKO WYSINGER.  On that day, they had traveled from Winchester, Virginia, to an area near KENDALL DEMARKO WYSINGER's residence in West Virginia in order to purchase a quantity of heroin from him.  One of those individuals was working in prostitution at the time.  KENDALL DEMARKO WYSINGER regularly supplied her with heroin at the time, but he would not deliver the substance to her directly.  Instead, KENDALL DEMARKO WYSINGER sent his girlfriend, known to this female individual as "Leslie," to

4

deliver the heroin to them.  I have determined through my investigation that "Leslie" is Leslee

GARZA,[1] with whom KENDALL DEMARKO WYSINGER shares a child.  On June 9, 2015,

GARZA, acting on behalf of KENDALL DEMARKO WYSINGER, delivered heroin to a female

working in prostitution.  That heroin was used in Winchester, Virginia, by another female who

overdosed the same day.  Laboratory analysis of the drugs involved in the overdose determined

that the substance was fentanyl.  Fentanyl is a Schedule II controlled substance, a synthetic

opioid often substituted by drug dealers for heroin.

      12.     On March 23, 2016, Winchester Police Department (WPD) and Winchester Fire

and Rescue Department (WFRD) personnel were dispatched to a local motel in Winchester,

Virginia, after a 911 call referencing an unresponsive female subject, later identified as C.S.S.

Upon arrival, WPD found C.S.S. lying on the floor of Room 219.  WPD officers observed

another female, hereinafter Cooperating Witness 1 (CW1), doing chest compressions and took

over CPR from the female.  WPD Officers noted C.S.S. had vomit on her face and around her

head.  Shortly thereafter, WFRD arrived and assumed care of C.S.S.  C.S.S. was transported to

the hospital and was declared deceased a short time later.

      13.     An autopsy was conducted on C.S.S. by the Commonwealth of Virginia's Office

of the Chief Medical Examiner.  The cause of death was ruled as fentanyl poisoning.

      14.     CW1 told Officers she had seen C.S.S. use heroin earlier in the day, and that

C.S.S. had purchased that heroin from "Demarko D."   C.S.S. was working in prostitution at the

time.  After C.S.S. snorted the heroin, CW1 went outside the motel room so C.S.S. could have

sex with "Demarko D."   Through interviews with CW1 and other cooperating witnesses in this

_____

[1] GARZA subsequently died from an overdose of fentanyl on November 12, 2016.

5

investigation, your Affiant has learned that KENDALL DEMARKO WYSINGER utilizes "D" as an alias and is known to associates as both Kendall and Demarko.

15.     CW1 said C.S.S. contacted KENDALL DEMARKO WYSINGER via cellular telephone and asked him to pick them up.  KENDALL DEMARKO WYSINGER picked up CW1 and C.S.S. at a convenience store in West Virginia, and began driving them to their hotel in Winchester, Virginia.  During that drive, CW1 heard C.S.S. discussed trading money and sexual acts with KENDALL DEMARKO WYSINGER in exchange for a quantity of heroin. KENDALL DEMARKO WYSINGER changed directions, driving to his home in Bunker Hill, West Virginia, to pick up heroin from inside.

16.     CW1 stated she observed C.S.S. pay approximately $189 to KENDALL DEMARKO WYSINGER, but does not remember when the money exchanged hands.  CW1 believes that some of the money was still in the possession of C.S.S. and CW1 when they returned to the hotel in Winchester, Virginia.  CW1 observed KENDALL DEMARKO WYSINGER give a package of what she believed to be heroin to C.S.S., but does not remember when the drugs exchanged hands.  CW1 stated it was this substance, believed to be heroin that she and C.S.S. used on March 23, 2016.  Shortly after CW1 ingested the substance, she stepped outside the hotel room, and then blacked out.  She woke up to find herself lying on the bed inside the room, and felt sick from the drugs she ingested.  When WFRD arrived on scene to treat C.S.S., they determined CW1 to be suffering from the effects of an opiate overdose and administered Narcan to her to revive her.

17.     CW1 stated that, from the time they left Bunker Hill, West Virginia, until C.S.S. snorted the heroin at the hotel in Winchester, Virginia, KENDALL DEMARKO WYSINGER was continuously in the presence of CW1 and C.S.S.

6

18.    In the days after the death of C.S.S., CW1 stated she was in contact with KENDALL DEMARKO WYSINGER via Facebook Messenger, using SUBJECT ACCOUNT 1, and provided screenshots of those contacts to your Affiant.  CW1 believes KENDALL DEMARKO WYSINGER found her Facebook contact information through the Facebook page of C.S.S.

19.    In one of the contacts on March 25, 2016, KENDALL DEMARKO WYSINGER asked CW1 to call him so he could explain "what went on after I seen you guys" and further wrote "I'm hurt over this as well because u also died that day and I brought you back in the room."  KENDALL DEMARKO WYSINGER also told CW1 in those messages that he was "helping give y'all [sic] a ride to y'all [sic] room me and [C.S.S.] never got to have sex" before CW1 passed out.

20.    During the processing of the scene on March 23, 2016, WPD officers noted that no drugs or drug paraphernalia were located at the scene and stated "it was apparent that someone had cleaned it up."  In a Facebook Messenger post with CW1 on March 25, 2016, KENDALL DEMARKO WYSINGER wrote to CW1 "Whatever y'all had left in the room that's was on the table I flush it because I was freak out if u would call I'll tell u what really happen."

21.    In this string of Facebook Messenger contacts between KENDALL DEMARKO WYSINGER and CW1, KENDALL DEMARKO WYSINGER provides the phone number 443-591-2398 to CW1 and asked her to call him to discuss what happened.  After serving a DEA Administrative Subpoena on the wireless carrier, it was learned the subscriber to that telephone number is KENDALL DEMARKO WYSINGER.  Through other aspects of this investigation, your Affiant has learned KENDALL DEMARKO WYSINGER is the user of this cellular telephone.  The 443-591-2398 telephone number is linked to the Facebook account of

7

KENDALL DEMARKO WYSINGER and this number was also associated to KENDALL

DEMARKO WYSINGER in a May 2016 arrest in Ocean City, MD on drug and prostitution

related offenses.

22.     Additionally, in interviews with Cooperating Witness 2 (CW2), law enforcement

learned that, the day after C.S.S.'s death, KENDALL DEMARKO WYSINGER admitted to

CW2 that he had sold heroin to C.S.S. and CW1, and that the heroin caused C.S.S.'s death.

KENDALL DEMARKO WYSINGER told CW2 that C.S.S. passed out shortly after they began

engaging in sexual activities, that he found CW1 passed out on the balcony and dragged her back

inside, that he flushed the drug paraphernalia from the scene, and that he left C.S.S. and CW1 on

the bed in the motel room in Winchester, Virginia.

23.     CW2 met KENDALL DEMARKO WYSINGER through C.S.S., while CW2 was

working in prostitution.  C.S.S. was working in prostitution at KENDALL DEMARKO

WYSINGER's direction, and KENDALL DEMARKO WYSINGER was C.S.S.'s pimp at the

time.  C.S.S. recruited CW2 to work in prostitution for KENDALL DEMARKO WYSINGER.

He supplied both CW2 and C.S.S. with heroin on a routine basis.

24.     CW2 described how KENDALL DEMARKO WYSINGER and GARZA set up

prostitution ads for CW2 and C.S.S. on Backpage.com.[2]  KENDALL DEMARKO WYSINGER

and GARZA arranged "dates" with prostitution customers and set prices for CW2 and C.S.S.

KENDALL DEMARKO WYSINGER drove CW2 to "dates," frequently across state lines and in

_____

[2] Backpage.com is an internet service provider of classified advertising and listing services
specific to a user's geographic location.  Until early 2017, Backpage.com provided a section of
classified advertising specific to "Adult Services," which commonly listed advertisements by
users offering sexual services in exchange for money and engaging in prostitution in a separate
subsection called "Escort Services."

particular from West Virginia into Virginia on multiple occasions. CW2 had to pay KENDALL DEMARKO WYSINGER the money that she made in prostitution, and, in reviewing text messages from a cell phone identified as belonging to KENDALL DEMARKO WYSINGER recovered in May 2016, at least one message shows CW2 had to ask KENDALL DEMARKO WYSINGER for permission to keep a portion of the money she was earning in prostitution for herself.

25.     KENDALL DEMARKO WYSINGER expected to be the sole supplier of heroin for CW2's personal use. KENDALL DEMARKO WYSINGER also gave CW2 drugs to distribute to her prostitution customers on his behalf.

26.     In August 2015, CW2 reported that KENDALL DEMARKO WYSINGER drove her from West Virginia to Shenandoah County, Virginia, to engage in prostitution with a customer. A witness interviewed by law enforcement recounted seeing CW2 arrive for the prostitution date in a vehicle, a late-model Chevy Camaro or Ford Mustang, matching the description of one registered to KENDALL DEMARKO WYSINGER. When the prostitution customer asked CW2 to stay longer than the pre-arranged visit, CW2 reported that she had to ask for permission, and stepped outside to make a phone call. Text messages and call logs between KENDALL DEMARKO WYSINGER and CW2 for that date reflect that she contacted him on that occasion, and told him the amount of money she expected to receive from staying. Text messages and call logs show that CW2 contacted KENDALL DEMARKO WYSINGER to pick her up after the date.

27.     CW2 reported that she had witnessed KENDALL DEMARKO WYSINGER threaten violence against GARZA and C.S.S. She described one occasion when she was present in the home of KENDALL DEMARKO WYSINGER in West Virginia when he used a pistol to

9

hit GARZA during an argument. CW2 described a different occasion when she was present in the home of KENDALL DEMARKO WYSINGER in West Virginia when she witnessed C.S.S. lock herself in a bathroom in order to guard against physical violence from KENDALL DEMARKO WYSINGER during an argument. CW2 and C.S.S. were working in prostitution at KENDALL DEMARKO WYSINGER's direction at the time. CW2 reported KENDALL DEMARKO WYSINGER wanted her to feel intimidated, threatened, and scared of him, and described that she snuck out of his house any time she wanted to leave without his permission for fear of what would happen.

28.    On July 5, 2017, CW2 received a message through Facebook Messenger from the daughter of KENDALL DEMARKO WYSINGER, indicating that KENDALL DEMARKO WYSINGER had asked her to reach out to CW2 and asking for CW2's telephone number so that KENDALL DEMARKO WYSINGER could contact her. At that time, CW2 was cooperating with law enforcement in the investigation into KENDALL DEMARKO WYSINGER. CW2 did not provide her telephone number to KENDALL DEMARKO WYSINGER's daughter. CW2 was afraid that KENDALL DEMARKO WYSINGER was trying to find her. She contacted law enforcement about her concerns and provided screenshots of the communications to your Affiant.

29.    In a review of a cell phone seized from KENDALL DEMARKO WYSINGER during his May 2016 arrest for human trafficking and prostitution in Maryland, KENDALL DEMARKO WYSINGER used SUBJECT ACCOUNT 1 to send a message to GARZA in October 15, 2015, threatening to kill her and saying he was "coming for" her in relation to a message she sent regarding his drug stash.

10

30. In statements made by a female individual working in prostitution, Cooperating Witness 3 (CW3), she described how, while she was working in prostitution in Maryland, West Virginia, and Virginia, she was approached by KENDALL DEMARKO WYSINGER posing initially as a prostitution customer. CW3 advertised herself for prostitution on Backpage.com. After KENDALL DEMARKO WYSINGER contacted her to make a date, he became her regular source of supply for controlled substances, including heroin. After a few months of regular contact with KENDALL DEMARKO WYSINGER, he asked CW3 in May 2016 to accompany him to Ocean City, Maryland, to engage in prostitution. CW3 described that she did not want to go to Ocean City with KENDALL DEMARKO WYSINGER, but felt intimidated by him and was concerned that he would cut off her source of supply for drugs. CW3 explained that she was intimidated by KENDALL DEMARKO WYSINGER because she was concerned KENDALL DEMARKO WYSINGER would "beat her" or find someone to "beat her" if she crossed him.

31. During the trip to Ocean City, CW3 engaged in prostitution, carried KENDALL DEMARKO WYSINGER's supply of drugs for him, and sold drugs to her customers in prostitution for KENDALL DEMARKO WYSINGER. When CW3 was arrested during an undercover prostitution sting, KENDALL DEMARKO WYSINGER was arrested as well and charged with state offenses of human trafficking and drug possession.

32. After his arrest, KENDALL DEMARKO WYSINGER asked CW3 to attend an initial court appearance on his behalf, in order to send a "message" to law enforcement that she was "on his side." CW3 complied with that request. After that preliminary appearance, KENDALL DEMARKO WYSINGER approached CW3 and asked her to provide false statements to law enforcement and the court about his involvement in the events in Ocean City, specifically that she should take responsibility for the drugs that were recovered and should tell

11

them that he was "not her pimp." CW3 agreed out of fear of physical violence from KENDALL DEMARKO WYSINGER if she refused, but she ceased all contact with him after that occasion and never returned to court with him.

33.     In statements made by a female individual working in prostitution, Cooperating Witness 4 (CW4), she described how, while she was working in prostitution in Maryland, West Virginia, and Virginia, she was approached by KENDALL DEMARKO WYSINGER posing initially as a prostitution customer. CW4 said she knew him as "Demarko." CW4 stated she met him through Backpage.com and said he contacted her for a date in or about the winter of 2014 to 2015. CW4 said she knew KENDALL DEMARKO WYSINGER to sell cocaine, crack cocaine and marijuana and smoked marijuana with him on occasion. CW4 stated at one point KENDALL DEMARKO WYSINGER asked her to come work for him in prostitution, but she initially declined, as she believed she did not need his help. Later, KENDALL DEMARKO WYSINGER sent CW4 a friend request on Facebook, and she accepted. KENDALL DEMARKO WYSINGER used two different Facebook accounts to communicate with her about prostitution, namely SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2.

34.     Through Facebook Messenger messages from these accounts, sometime between spring 2015 and fall 2016, KENDALL DEMARKO WYSINGER approached CW4 again about working for him in prostitution. CW4 agreed to try working for KENDALL DEMARKO WYSINGER, and, on that occasion, KENDALL DEMARKO WYSINGER picked her up from Hagerstown, Maryland, drove her to a date with a prostitution customer in Winchester, Virginia, and then waited for her to finish the date. KENDALL DEMARKO WYSINGER got a room for CW4 at the Red Roof Inn in Winchester, Virginia, and, while based there, KENDALL DEMARKO WYSINGER advertised CW4 for prostitution on Backpage.com. CW4 paid

12

KENDALL DEMARKO WYSINGER $40 from her first date in Virginia, but KENDALL DEMARKO WYSINGER's subsequent attempts to sell her in prostitution on Backpage.com were unsuccessful. CW4 described KENDALL DEMARKO WYSINGER as disorganized in how he operated the prostitution advertisements and in how he treated her, as she did not use drugs and was not as "easily controlled" as those who were addicted to drugs and working in prostitution.

35. CW4 provided screenshots of several Facebook Messenger conversations to your Affiant from SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2. On May 25, 2015, KENDALL DEMARKO WYSINGER used SUBJECT ACCOUNT 2 to contact CW4 and asked her if she had a room. CW4 explained she did not because she was on her period and KENDALL DEMARKO WYSINGER told her he would get her tomorrow and said "I'll get u a room at motel 6 in Spring Mills". I know that Spring Mills is located in West Virginia. Based on my training and experience and the context of this communication, I believe that WYSINGER used SUBJECT ACCOUNT 2 to try to recruit CW4 into working for him in prostitution in West Virginia.

36. On November 15, 2016, KENDALL DEMARKO WYSINGER utilized SUBJECT ACCOUNT 1 to contact CW4. KENDALL DEMARKO WYSINGER asked CW4 if she was available by writing "Hey Babe like to see you soon." CW4 replied to KENDALL DEMARKO WYSINGER and told him it would be $100 for her time. KENDALL DEMARKO WYSINGER continued and referenced the Leslee GARZA fatal overdose by telling CW4 "She od" and "Died on me Sunday" and "She die at her moms house." KENDALL DEMARKO WYSINGER then asked CW4 if she would do "$60". Based on my training and experience and

13

the context of this communication, I believe that KENDALL DEMARKO WYSINGER was using SUBJECT ACCOUNT 1 to offer to pay CW4 $60 to engage in commercial sex with him.

37.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

38.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

39.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

40.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a

14

Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

41.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

42.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

15

43. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

44. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

45. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

46. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

47. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

16

48.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

49.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

50.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

51.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a

17

Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

52. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning

18

subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

53.     Specifically, there is probable cause to believe that KENDALL DEMARKO WYSINGER used SUBJECT ACCOUNT 1 and SUBJECT ACCOUNT 2 to communicate with individuals engaged in prostitution, in an effort to recruit them into his employ in prostitution, and to communicate with individuals regarding his distribution of drugs, and used that account to pass along messages intended to threaten those individuals or to influence their communications to law enforcement about his criminal activities.

54.     On November 30, 2017, your Affiant received a search warrant for the requested KENDALL DEMARKO WYSINGER's Facebook accounts.  On December 1, 2017, your Affiant submitted the Search Warrant to Facebook, through official channels, and received a confirmation receipt.  On December 12, your Affiant received notification that Facebook advised the signed Order to Seal will not act as a Non-disclosure Order and that they would still disclose to their client the search warrant and subsequent disclosure to law enforcement.  On December 14, 2017, your Affiant replied through channels that it was permissible for Facebook to disclose to their client the search warrant and records release.

55.     On January 11, 2018, your Affiant was advised that Facebook would require that a new warrant would have to be submitted to receive the requested information, as Facebook would not produce the records absent a non-disclosure order, and did not produce any of the records sought in the warrant.  The original warrant was returned to this Court indicating that no records had been received.

56.     On January 21, 2018, your Affiant submitted a preservation request to Facebook for Subject Account 1 and Subject Account 2.  On the same date, your Affiant received

19

confirmation from Facebook that "We have taken reasonable steps to preserve the account(s) you requested.  Your case number is 1432051."  I am now seeking this new search warrant for these records to obtain them from Facebook.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

57.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), and Rule 41 of the Federal Rules of Criminal Procedure by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

20

## **CONCLUSION**

58.     Based on the forgoing, I request that the Court issue the proposed search warrant.

59.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a court that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

60.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.


Respectfully submitted,

/s/Thomas F. Hickey_____
Thomas F. Hickey
Special Agent
Drug Enforcement Administration


Received by reliable electronic means and sworn and attested to by telephone on February 23, 2018.

_____
UNITED STATES MAGISTRATE JUDGE

21

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the (1) Facebook user ID name "Kendall Demarko Wysinger" and user ID number "100002283315590" and found at www.facebook.com/Kendall.Wysinger **AND** (2) Facebook user ID name "Demarko Wysinger" found at www.facebook.com/Demarko.Wysinger that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

### I.     Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including (1) Facebook user ID name "Kendall Demarko Wysinger" and user ID number "100002283315590" and found at www.facebook.com/Kendall.Wysinger **AND** (2) Facebook user ID name "Demarko Wysinger"  found at www.facebook.com/Demarko.Wysinger**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)     All photos and videos uploaded by those user IDs and all photos and videos uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which

the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

2

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of violations of 18 U.S.C. §§ 1512, 1591, and 2422, and 21 U.S.C. § 841 involving KENDALL DEMARKO WYSINGER (aka "Demarko" and "D") since January 1, 2014, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Communications by KENDALL DEMARKO WYSINGER with CW1 in which he discussed the destruction of drugs and drug paraphernalia in order to impede the investigation;

(b) Communications between KENDALL DEMARKO WYSINGER, CW2, CW3, CW4, and/or others, related to prostitution activities;

(c) Communication between KENDALL DEMARKO WYSINGER and others related to the investigation into his criminal activities involving prostitution, drug distribution and witness tampering;

(d) Communication between KENDALL DEMARKO WYSINGER and others regarding threats made towards or attempts to influence individuals involved in prostitution and drug distribution;

(e) Evidence of KENDALL DEMARKO WYSINGER's involvement in prostitution;

(f) Evidence of drug distribution by KENDALL DEMARKO WYSINGER;

3

(g) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(h) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(i) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s); and

(j) The identity of the person(s) who communicated with the user ID about matters relating to human trafficking, including records that help reveal their whereabouts.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS
## RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct. I am employed by Facebook, and my official

title is _____. I am a custodian of records for Facebook. I state

that each of the records attached hereto is the original record or a true duplicate of the original

record in the custody of Facebook, and that I am the custodian of the attached records consisting

of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of

the matter set forth, by, or from information transmitted by, a person with knowledge of those

matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity

of Facebook; and

c.      such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.


_____          _____
Date                               Signature